IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-00256-MSK-MJW

NIKKI A. SMITH,

       Plaintiff,

v.

WELLPOINT, INC., d/b/a Anthem Blue Cross and Blue Shield,

       Defendant.

_____

**OPINION AND ORDER GRANTING, IN PART,
MOTION FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to Wellpoint's Motion for Summary

Judgment[1] (**# 25**), Ms. Smith's response (**# 30**), and Wellpoint's reply (**# 34**).[2]

## FACTS

      The Court provides this brief background of the case, elaborating on certain factual

matters more fully as necessary in the analysis. In doing so, the Court resolves all disputed facts

---

[1]Wellpoint submitted 8 exhibits (several of which include subparts) in support of its motion, but grouped all of the exhibits into a single 250-page "Appendix." This does not comply with the Court's Electronic Case Filing Procedures (Civil), v. 3.0. Part V.H.3 of those procedures states that "Each exhibit referenced in a . . . motion . . . shall be submitted to ECF as a separate ECF attachment. . . ."

[2]Wellpoint filed a Motion to Strike (**# 33**) evidence attached to Ms. Smith's summary judgment response, citing various alleged evidentiary deficiencies. Such arguments are properly presented as a reply in support of Wellpoint's summary judgment motion, and the Court treats the Motion to Strike as a reply.

most favorably to the non-movant.

Ms. Smith, who is black, was employed by Wellpoint as a Customer Service Representative. In October 2006, Wellpoint accused Ms. Smith of having falsified her time records on at least four occasions, reporting to the payroll department that she had worked on certain days when she had not. On October 6, 2006, Wellpoint terminated Ms. Smith's employment.

Ms. Smith's Complaint **(# 1)** alleges three causes of action: (i) a claim that she was both discriminated against because of her race and retaliated against because of having made prior complaints of discrimination, in violation of Title VII, 42 U.S.C. § 2000e *et seq.,* ( that she was provided with less favorable terms and conditions of employment, denied promotions, and ultimately terminated); (ii) a claim for race discrimination in violation of 42 U.S.C. § 1981, based on the same events; and (iii) a claim for breach of contract, apparently asserted under Colorado common law, alleging that Wellpoint retaliated against her for reporting unethical acts of others to her superiors, contrary to corporate policies contained in an Employee Handbook that promised no retaliation would result from reporting unethical conduct.

Wellpoint now moves **(# 25)** for summary judgment on each of Ms. Smith's claims, arguing: (i) with regard to the claim that her termination was the result of race discrimination, that Ms. Smith cannot show that the reason proffered by Wellpoint for her termination – timecard falsification – is a pretext for race discrimination; (ii) with regard to the claim that her termination was unlawful retaliation, that Ms. Smith cannot show a causal connection between her protected activity and her termination, and cannot show that the reason proffered by Wellpoint for the termination is a pretext for retaliation; (iii) with regard to claims of

discriminatory failure to promote, Ms. Smith cannot establish a *prima facie* case with respect to at least one of the challenged promotions because she cannot show circumstances giving rise to an inference of discrimination, and with regard to the remaining promotions, cannot show that Wellpoint's proffered reasons for denying those promotions is a pretext fo race discrimination; and (iv) with regard to the breach of contract claim, Ms. Smith cannot establish that the Employee Handbook constitutes an enforceable contract.

## ANALYSIS

### A. Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment. If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. Race discrimination claims – termination**

Ms. Smith asserts claims that her termination was racially motivated under both Title VII and 42 U.S.C. § 1981. The analysis is the same for both claims. *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995). To establish a claim under either statute, Ms. Smith must make a *prima facie* showing that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination; Wellpoint must respond by proffering a legitimate, non-discriminatory reason for that adverse action, and Ms. Smith has the ultimate burden of proving that the proffered reason is a pretext for race discrimination. *Turner v. Pub. Serv. Co. of Colo.*,

563 F.3d 1136, 1142 (10th Cir. 2009). With regard to the claim premised on Ms. Smith's termination, Wellpoint does not dispute that Ms. Smith can establish a *prima facie* claim of race discrimination, and Wellpoint carries its burden by proffering a non-discriminatory reason for that termination – that Ms. Smith engaged in timecard fraud. Thus, the Court turns to the question of whether Ms. Smith can show Wellpoint's explanation to be a pretext for race discrimination.

An employee may show that a proffered explanation is pretextual by pointing out weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the explanation such that a reasonable factfinder would find that explanation unworthy of belief. *Turner*, 563 F.3d at 1142-43. However, the Court undertakes this analysis mindful that the question is not whether Ms. Smith <u>actually</u> falsified her time records, but rather, whether Wellpoint's supervisors subjectively <u>believed</u> – rightly or wrongly – that she had. The fact that Wellpoint may have acted on a belief that, in hindsight, is revealed to have been wrong does not amount to unlawful discrimination; to prove her claim, Ms. Smith must come forward with evidence that Wellpoint "didn't really believe its [own] proffered reasons" at the time it took action. *Johnson v. Weld County* 594 F.3d 1202, 1211 (10th Cir. 2010).

The facts in the record, taken in the light most favorable to Ms. Smith, reveal as follows. On or about September 25, 2006, George Roupas, Ms. Smith's supervisor, noticed certain discrepancies between records on Wellpoint's payroll system and Wellpoint's Paid Time Off ("PTO") database concerning Ms. Smith. Mr. Roupas contacted Ms. Smith, asking her which database she used to log her work time. Ms. Smith responded that she did not use any database to record her time because of a "system issue" that made it impossible to use the database

commonly used by employees to record their time. Mr. Roupas explained to her that he was conducting an "audit" of her time records. The following day, Mr. Roupas met with Ms. Smith, at which time he informed her that she had reported time to the payroll system when the PTO calendar showed that she was off work. Mr. Roupas apparently showed Ms. Smith records demonstrating two instances[3] in which this occurred. With regard to one instance, Ms. Smith contends that it was Mr. Roupas himself who entered her time into the payroll system, and with regard to the other instance, Ms. Smith stated that she had requested to take paid time off that day, but another supervisor, Aleasha Sykes, "allowed me to work from home." Ms. Smith stated that, with regard to this second occasion, "I evidently worked on that day at home." She requested that Mr. Roupas confer with Ms. Sykes and contact the IT department to determine whether Ms. Smith had logged into the system on the days in question, but, to her knowledge, Mr. Roupas did not do so. Ms. Smith states that she had no further contact of any significance with Mr. Roupas after the September 27, 2006 meeting, and on October 4, 2006, was notified by the Human Resources Department that she was terminated.

Mr. Roupas has submitted an affidavit detailing his investigation into this matter, and Ms. Smith has not adduced any evidence rebutting Mr. Roupas' statements to this effect. Mr. Roupas states that "it would be highly unlikely for any of the [Customer Service Representatives] who reported to me to work an entire nine hour shift – much less four nine hour shifts – without exchanging a single e-mail with me or without turning in a spreadsheet documenting the work[ ]

---

[3]Ms. Smith contends that the other two instances of inconsistencies that Wellpoint now relies upon were not disclosed to her until an unemployment hearing well after her termination. For purposes of this motion, the Court will treat Ms. Smith's contention as true and assume that only two instances of inconsistencies were disclosed to her by Mr. Roupas at the September 27, 2006 meeting.

they had performed."  Mr. Roupas states that he "search[ed] my e-mails, sorting them by sender and by date, attempting to find any emails to [Ms.] Smith from me or from [Ms.] Smith to me," but was unable to locate any.  He also requested that Ms. Smith look into her own records for documentation that would clarify the situation, but Ms. Smith did not locate any.

On this record, the Court finds that Ms. Smith has failed to come forward with evidence sufficient to demonstrate a triable issue of fact as to whether Mr. Roupas indeed believed that Ms. Smith had made false entries in the payroll system.  The key fact in this regard is the statement by Mr. Roupas, unrebutted by Ms. Smith, that "it would be highly unlikely" for an employee like Ms. Smith to work a full day without "exchanging a single e-mail with me or without turning in a spreadsheet documenting the work they had performed."  Ms. Smith does not dispute Mr. Roupas' contention that he was unable to locate any e-mails exchanged between them for the dates in question, nor does she dispute that she did not turn in a spreadsheet documenting the work she had performed on those days.  By Mr. Roupas' standards, this would be a "highly unlikely" situation even if it had occurred once, and the fact that it occurred repeatedly makes it reasonable for Mr. Roupas to believe that Ms. Smith had falsely claimed to work on days that she did not.

Ms. Smith offers a variety of arguments that attack Mr. Roupas' conclusion from varying angles – stating that she did not have access to the database most commonly used by Wellpoint employees to keep private records of their hours (thus depriving her of a tool that, had it been used, might have provided evidence that would have supported her contention that she had indeed worked the days she claimed), that entries in the PTO database are sometimes inaccurate, etc. –  but none of them undercut the key fact that neither Mr. Roupas nor Ms. Smith were able

to locate any actual work product produced by Ms. Smith on the days in question.[4] In the absence of work product that one would expect to find had Ms. Smith worked on the days in question, the Court cannot say that Ms. Smith has carried her burden of showing that Mr. Roupas did not subjectively believe, at the time he decided to terminate her, that the accusations made against her had merit. Thus, she is unable to carry her burden of demonstrating that that reason given by Wellpoint for her termination is pretextual.

Even if Mr. Roupas did indeed believe that Ms. Smith had engaged in misconduct, it would nevertheless be possible for Ms. Smith to demonstrate pretext through an alternative means: by showing that similarly-situated non-black employees engaged in the same misconduct were treated more favorably. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167-68 (10th Cir. 2007). To establish a genuine issue for trial under this approach, Ms. Smith must show that a non-black employee was "similarly-situated" to her "in all relevant respects" – that is, the other employee was subject to the same work rules, the same supervisor, had a similar work history, and transgressed a work rule of "comparable seriousness" to that violated by Ms. Smith. *Id.; Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230, 1232 (10th Cir.

---

[4]Wellpoint has submitted evidence further corroborating the fact that there is no record of Ms. Smith generating work product during the time period in question. For example, Wellpoint has produced telephone logs that show Ms. Smith did not take any telephone calls on the relevant days, and despite Ms. Smith's supposition that she may have worked from home only handling correspondence on those days, there is no record of any correspondence written by her bearing the dates in question. Nevertheless, as discussed above, the key inquiry in the pretext analysis is what the decisionmaker believed (and on what basis) <u>at the time her or she took the action</u>, not whether the decisionmaker was later able to obtain evidence justifying a decision that had already been made and carried out. Neither Mr. Roupas' affidavit or the other exhibits produced by Wellpoint indicate that Mr. Roupas was in possession of evidence such as the telephone logs at the time the decision was made to terminate Ms. Smith, and thus, the Court does not consider them in assessing the pretext question.

2000).

Ms. Smith alleges that she is similarly situated to two individuals who falsely reported her time but who were not terminated. Ms. Smith specifically identifies Eva Lopez, a Hispanic female, as a person who was alleged to have falsely reported her time but was not terminated. The only evidence that concretely refers to Ms. Lopez on this point is an e-mail from Ms. Lopez to Ms. Smith, dated Mar 2, 2007, which reads "Hey girl what's up? Any work yet? Aleasha is trying to get me for falsifying time. Give me a call." This single reference to Ms. Lopez being accused of "falsifying time" is insufficient to demonstrate that the two women are similarly-situated. The record does not reflect the circumstances of the allegations against Ms. Lopez, the nature of the falsification, the amount of time involved, the extent of evidence supporting the accusations. This makes it impossible for the factfinder to ascertain whether those circumstances are similar to those involving Ms. Smith, nor does the record reflect that Ms. Lopez and Ms. Smith had a comparable work history.[5] Thus, no inference of pretext can be drawn from the fact that the two women were apparently treated differently.

Ms. Smith also points to somewhat nebulous testimony by Ms. Sykes about an employee that may or may not have been Ms. Lopez. Ms. Sykes could not specifically remember the employee involved, but recalled that the employee was "not a black person" and was "accused of submitting false time on her payroll time sheets." Ms. Sykes testified that she was asked to collect certain calendar data involving the employee and forward it to Human Resources, where "Sandy [Bane] reviews them, and then call[s the employee] down and give them a chance to, you know, rebuttal why it is or explain the discrepancies." Ms. Sykes remembers that, whoever the

---

[5]The record reflects that Ms. Lopez was ultimately terminated for attendance problems.

employee involved in this situation was, "Sandy was like – she just wanted to fire them. And then they had to call the attorney or something to see if they can fire them. And then when [another Human Resources representative] came back, she said that we couldn't fire them, we had to put them on a disciplinary action. Whichever associate that was." As with Ms. Smith's showing regarding Ms. Lopez, the testimony from Ms. Sykes is not sufficiently specific to permit a factfinder to conclude that the employee being discussed had engaged in misconduct of "comparable seriousness" to Ms. Smith – it is not clear how many days or hours were involved, how culpable the employee was, or how strong the evidence was against her. More importantly, this testimony reveals that the decision made regarding this employee was not made by Mr. Roupas (or Laurie Patrick, whom Ms. Smith contends was also involved in the decision to terminate her), but by "the attorney or something."[6] Thus, because the same decisionmaker was not involved in both instances, the factfinder cannot infer that the differential treatment afforded the two women permits an inference of discrimination.

Accordingly, the Court finds that Ms. Smith has not carried her burden of coming forward with evidence that would demonstrate that Wellpoint's proffered reason for her termination was a pretext for race discrimination. Thus, Wellpoint is entitled to summary judgment on her Title VII and § 1981 race discrimination claims premised on her termination.

**C. Retaliation claims - termination**

Ms. Smith alleges that she was terminated in retaliation for having complained of prior

---

[6]Ms. Sykes obviously lacks personal knowledge of the deliberations that resulted in Ms. Bane's recommendation of termination not being adopted. Thus, Ms. Sykes' testimony is of limited value on this issue. Ms. Smith has not come forward with evidence from anyone else with more direct knowledge of the events in question.

incidents of race discrimination.  Both Title VII and § 1981 protect an employee against

retaliation for having complained of or assisted in the investigation of race discrimination claims.

42 U.S.C. § 2000e-3(a), *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1961 (2008).  The

same substantive analysis applies to retaliation claims under both statutes.  *Fincher v. Depository

Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). To establish a claim for retaliation,

an employee must show: (i) that she engaged in protected activity; (ii) that she suffered an

adverse employment action; and (iii) that there is a causal connection between the adverse action

and the protected conduct; the burden then shifts to the employer to articulate a non-retaliatory

reason for the adverse action, and the employee bears the ultimate burden of showing that the

employer's proffered reason is a pretext for retaliation.  *Fye v. Oklahoma Corp. Comn.*, 516 F.3d

1217, 1227 (10th Cir. 2008).   To be considered "adverse" for retaliation purposes, an action must

be one which "might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006).

Most commonly, an employee attempting to establish the causal connection element will do so

by showing a close temporal proximity between the protected activity and the adverse action.

*Fye*, 516 F.3d at 1228, *citing Haynes v. Level 3 Communications Inc.*, 456 F.3d 1215, 1228 (10th

Cir. 2006).  "Close" temporal proximity means a period of days or a few weeks – a six week

period between protected conduct and adverse action might be sufficient, of itself, to indicate

causation, but a three month period would not. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171,

1179 (10th Cir. 1999).  If sufficient temporal proximity cannot be shown, the employee must

come forward with some additional evidence from which the factfinder could infer some causal

relationship between the two events.  *Haynes*, 456 F.3d at 1228.   Moreover, the employee must

demonstrate that the decisionmaker had knowledge of the employee's protected conduct. *Hinds v. Sprint/United Mgmt.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

Wellpoint contends that Ms. Smith cannot show a causal connection between her acts of protected conduct and her termination. To ascertain whether such a connection exists, the Court must first determine what acts by Ms. Smith constitute protected conduct and when they occurred. Ms. Smith was one of several employees who made complaints of racial discrimination to Wellpoint's ombudsman in late 2004. Ms. Smith was one of two employees who also complained to the Ethics and Compliance Department on or about February 26, 2006 about certain case-closing procedures that were being used that they believed were unethical. There is some testimony that indicates that, as part of this complaint, Ms. Smith also complained about minorities not being interviewed for a possible transfer to a correspondence position. Thus, the Court finds that Ms. Smith engaged in these two acts of protected conduct. She has not identified any other instances in which she lodged complaints of race discrimination or otherwise engaged in protected conduct.

Obviously, neither the 2004 complaint to the ombudsman or the February 2006 complaint to the Ethics and Compliance Department are sufficiently close in time to the September 25, 2006 initiation of the investigation that led to Ms. Smith's termination such that the factfinder could infer a causal connection between the events based solely on their closeness in time. As the 10th Circuit has explained, a delay of three months is insufficient, *Anderson*, 181 F.3d at 1179; here, the delay was almost seven months.

Ms. Smith argues that the temporal proximity between her complaint and her termination is closer than it appears because Wellpoint supervisors began undertaking a pattern of retaliatory

conduct almost immediately after her complaint, and her termination was part of that pattern. In *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996), the 10th Circuit explained that a "pattern of retaliatory conduct that begins soon after the protected activity and only culminates later in actual discharge" may sometimes satisfy the temporal proximity test. *Quoted in Hinds*, 523 F.3d at 1204. To demonstrate such a pattern, the employee must point to instances of retaliation that are sufficiently adverse in their own right to constitute independent acts of prohibited retaliation. *See e.g. Steele v. Kroenke Sports Enterprises, LLC*, 264 Fed.Appx. 735, 746 (10th Cir. 2008) (unpublished); *compare Marx*, 76 F.3d at 329 (events constituting "pattern" were a disciplinary writeup shortly after the protected conduct, followed by a demotion, followed by termination). As the Supreme Court explained in *Burlington Northern & Santa Fe RR Co. v. White*, 548 U.S. 53, 68 (2006), an "adverse" action sufficient to support a retaliation claim is one which would dissuade a reasonable worker from engaging in protected conduct; on the other hand, "petty slights, minor annoyances, and simple lack of good manners" will not suffice.

Ms. Smith's "pattern" of retaliatory conduct occurring after her February 2006 complaint consists largely of the type of conduct that *White* would describe as "petty slights." Ms. Smith describes the conduct as "managers refused to talk to [me], gave [me] dirty looks, moved [my] desk so [I] would not sit near [another co-worker who complained], and switched [my] schedule." These are precisely the kind of "petty slights," "minor annoyances," and "lack of good manners" that do not amount to an adverse action under *White*.[7] *Steele,* 264 Fed.Appx. at

_____

[7]This is not to say that a "schedule change," as Ms. Smith mentions, cannot constitute an adverse action. *White* contemplates that the adversity of an employment action must be evaluated in light of the particular circumstances of the case. 548 U.S. at 69. Thus, "a schedule

13

746 ("Ms. Steele complains that Mr. Ackerman snubbed her and used Mr. Brockmeier as an intermediary after she told him that he made her sick. This sort of personality conflict did not constitute a materially adverse action. . . Nor was his alleged instruction to her co-employee not to join her on smoking breaks more than a "nonactionable petty slight"). Ms. Smith does allege that, beginning on March 20, 2006, she began applying for a series of promotions and transfers within Wellpoint, but was repeatedly denied. Arguably, denial of a promotion or transfer might, in some circumstances, constitute a materially adverse action. *White*, 543 U.S. at 71 (reassignment to (or denial of transfer out of) a position that is objectively less desirable than another can constitute adverse action). But, as discussed in more detail below, Ms. Smith has failed to come forward with evidence that demonstrates that most of these denials were retaliatory. Where there is insufficient evidence that an act is impermissible retaliation, it cannot constitute a "pattern of retaliation" sufficient to extend the temporal proximity component of the causal connection element. Accordingly, the Court finds that Ms. Smith has failed to come forward with sufficient evidence to demonstrate a causal connection between her protected conduct and her termination via temporal proximity.

More importantly, Ms. Smith has failed to come forward with evidence that would establish that Mr. Roupas (or, arguably, Laurie Patrick) – the decisionmaker with regard to her

---

change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* Here, however, Ms. Smith has not elaborated on how her schedule was changed nor described any circumstances that could lead the factfinder to conclude that such a change would be deemed "materially adverse" by a reasonable employee in Ms. Smiths' situation.

termination[8] – had any knowledge of Ms. Smith's protected conduct.  Wellpoint has submitted

an affidavit of Laura Arambula, the person who took the February 2006 complaint, that states

that she did not share the nature or content of that complaint with Mr. Roupas, as well as an

affidavit of Mr. Roupas that denies that he had knowledge of Ms. Smith's February 2006

complaint at the time he made the decision to terminate her.  Ms. Smith responds that

"circumstantial evidence" demonstrates "that managers knew" of the February 2006 complaint.

Ms. Smith contends that she subjectively "felt retaliated against" by Mr. Roupas immediately

after making the complaint and that she believes Mr. Roupas "started unfairly criticizing her

work," and she contends that another manager testified to hearing "rumors" that someone (the

manager testified that no names were attached to these rumors, and Ms. Arambula's deposition

testimony corroborates that contention) had complained about "compliance" (apparently

meaning the managers' case-closing procedures, not race discrimination).  Ms. Smith argues

that, from these facts, "managers' denials of knowledge of these complaints are highly disputed

and should not be determinative of this issue."

　　　　The Court disagrees.  The "evidence" tendered by Ms. Smith on this point is vague and

speculative, and is entirely insufficient to refute express statements by Ms. Arambula and Mr.

Roupas that deny any knowledge by Mr Roupas of Ms. Smith's protected conduct.  Under these

circumstances, Ms. Smith has failed to carry her burden of coming forward with evidence

---

[8]The record reveals that Mr. Roupas and/or Ms. Patrick called for Ms. Smith's
termination, and requested that Ms. Bane in Human Resources review and approve that
recommendation.  Ms. Bane did so.  There is some evidence in the record that Ms. Bane was
aware of Ms. Smith's 2004 complaint of race discrimination to the ombudsman, but the Court
finds that the protected conduct known to Ms. Bane is too remote in time and Ms. Bane's role in
the process – as simply approving a request for termination that had already been decided upon
by Mr. Roupas – too remote to permit any inference of causation to be drawn.

demonstrating a causal connection between her protected conduct and her termination. Accordingly, Wellpoint is entitled to summary judgment on Ms. Smith's retaliation claims to the extent they relate to her termination.

### D. Race discrimination & retaliation – promotions

Ms. Smith asserts independent race discrimination and retaliation claims premised upon Wellpoint denying various requests she made for promotions or transfers between March and August 2006. The same analytical framework discussed above applies to these claims as well.

Ms. Smith specifically identifies six instances in which she sought a transfer or promotion during this time period. Those instances are as follows:

> • On March 20, 2006, she applied for a Forecaster position. The position was given to Maxwell McDonald, a white male. Ms. Smith does not identify whether Mr. McDonald ever engaged in protected conduct. Ms. Bane was the decisionmaker. According to Ms. Smith, the reason given by Ms. Bane for rejecting Ms. Smith was that Ms. Bane never received Ms. Smith's application.

> • On April 17, 2006, she applied for a Customer Care Rep Lead position. Four people were hired for the position. Ms. Smith does not identify the races of the people hired, nor does she indicate whether any of those persons had previously engaged in protected activity. Anne Cooke was the decisionmaker, who may have been affiliated with "an outside consulting firm" that initially interviewed Ms. Smith for the position. Ms. Smith does not expressly indicate what she was told as to why the others were chosen over her, but implies that Ms. Cooke concluded that the other candidates were more qualified.

> • On April 26, 2006, she applied for a Grievance/Appeals Rep II position. The position was given to Lorina Marley. Ms. Smith does not identify Ms. Marley's race nor indicate whether Ms. Marley had previously engaged in protected activity. The decisionmaker was Lori James. Ms. Smith does not expressly indicate what she was told as to why Ms. Marley was chosen over her, but implies that Ms. James concluded that Ms. Marley was better qualified.

• On June 1, 2006, she again applied for a Grievance/Appeals Rep II position. She was initially interviewed by Pam Archuleta, who commented favorably on Ms. Smith's interview. Ms. Archuleta left the company before the hiring process was concluded. Ms. Smith understood that she would interview again with the new hiring manager, an unnamed male, but ultimately, was interviewed by Mr. Roupas' wife. According to Ms. Smith, the position was "cancelled" and no one was hired to fill it.

• On June 13, 2006, she applied for a Claims/Rep III position. Six individuals were hired for the position, but Ms. Smith does not identify these employees' races or whether or not they had engaged in protected conduct. She does not identify the decisionmaker for this position. Ms. Smith was not interviewed, and states that she has been told that the reason why is because she "did not have any claims processing experience." She contends that only one of the six people hired demonstrate claims processing experience on their applications.

• On July 17, 2006, she applied for a Customer Care Rep Lead position. Melissa Black, an Asian woman was hired. Ms. Smith does not indicate whether Ms. Black had ever engaged in protected conduct. The hiring manager was Dough Olsen. Ms. Smith was not interviewed, apparently because she had "minimal exposure to management processes and decision." She contends that that assessment is incorrect, and she had demonstrated experience in training new employees "on the system" (presumably the Customer Care system) and had previously "handled lead worker responsibilities." She acknowledges that she is not aware of Ms. Black's qualifications.

Without belaboring the analysis, the Court finds that Ms. Smith has not come forward with evidence that would demonstrate a *prima facie* case of either race discrimination or retaliation with regard to any of these positions. Turning first to the claim that she was denied these positions because of retaliation for her prior protected conduct, she must demonstrate a causal connection between that conduct and the denial of the position, including evidence that the decisionmaker knew of her protected conduct. She has not done so with regard to any of the positions. With the exception of the Forecaster position for which Ms. Bane was the

decisionmaker, Ms. Smith has come forward with no evidence whatsoever that the decisionmakers involved in the hirings were aware that Ms. Smith had ever engaged in any act of protected conduct.  This failure alone disposes of her retaliation claims with regard to all but the Forecaster position.  As to that position, the record indicates that Ms. Bane was aware of Ms. Smith's complaint to the ombudsman in 2004, but that protected activity is far too remote in time to the March 2006 hiring to satisfy the causal connection element.  Ms. Smith has not come forward with anything more than speculation that Ms. Bane was aware of her more recent complaint to Ms. Arambula, and without competent evidence from which the factfinder could infer Ms. Bane's knowledge of the more recent complaint, Ms. Smith cannot demonstrate any causal connection between her protected conduct and Ms. Bane's decision to hire someone else for the Forecaster position.

As to Ms. Smith's claims that she was denied the promotions or transfers because of her race, the Court observes that Ms. Smith has only identified the races of Mr. McDonald (the Forecaster position) and Ms. Black (the Customer Care Rep Lead position).  Without evidence as to the races of the other employees hired for the positions at issue, the Court cannot say that Ms. Smith's rejection occurred in "circumstances giving rise to an inference of discrimination."  In *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005), the court explained that this element can be satisfied in a number of ways, including a showing of "preferential treatment given to employees outside the protected class."  Logically, if Wellpoint awarded some of these positions to black applicants, Ms. Smith's claim that she was denied the position because of her race would be extremely difficult for the factfinder to accept.

Were the Court will assume the premise implicit in Ms. Smith's briefing – that none of

the individuals hired for these positions are black – even if that premise is not expressly alleged, the Court might conclude that Ms. Smith had established a *prima facie* case of race discrimination under *Plotke* as to all but the second Grievance/Appeals Rep II position.  That position was never filled, and thus, Ms. Smith cannot show that her race was the reason she was not selected for it.  Ms. Smith offers an abbreviated and completely unsubstantiated speculation that Wellpoint decided not to fill the position because Ms. Smith appeared to be the leading candidate for it, but lacking any evidence that lifts this contention beyond the realm of pure supposition, the Court finds that she has failed to demonstrate that her application for this position was rejected in circumstances giving rise to an inference of discrimination.  Thus, Wellpoint is entitled to summary judgment on her race discrimination claim with regard to this position.

Assuming that Ms. Smith has established a *prima facie* case of race discrimination with regard to the remaining positions, the Court would then inquire whether Ms. Smith had come forward with evidence that would show that Wellpoint's reasons for selecting others for these positions was pretextual.  With regard to four of these positions, the apparent reason given by Wellpoint for preferring other candidates over Ms. Smith was the belief that the other candidates were better qualified.  As the 10th Circuit explained in *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010), where the challenged employment action is a decision by an employer to hire or promote one applicant over another due to superior qualifications, the Court's inquiry into the pretext element is limited to determining whether the employee has shown an "overwhelming disparity in qualifications" between herself and the individual who was hired. This is because, as mentioned previously, Title VII does not permit the Court to second-guess an

employer's decision to weigh the relative merits of applicants with roughly comparable qualifications. *Id.* Rather, the Court intercedes only where it is apparent that the employer's proffered reason for preferring one candidate over another cannot possibly be true (*i.e.* where the proffered reason can be shown to be pretextual). This would occur only where there is an obvious and overwhelming disparity between the qualifications of two applicants, such that no reasonable employer acting in good faith could have weighed those qualifications any other way.

With regard to the four positions for which Ms. Smith was interviewed but not selected, she has not met the imposing burden created by *Johnson.* In several instances, she acknowledges that she (as well as the applicants who were selected) did not possess the particular qualifications required – "No one had experience with Medicare Part D because it was a new product"; "I did not have any claims processing experience [but] a review of these hirees' applications indicates that [ ] only one [had] real claims experience" – and argues that other qualifications she possessed could substitute. This makes satisfying the difficult burden of *Johnson* even more difficult, as weighing the relative merit of substitute qualifications introduces yet another layer of discretion for the employer to exercise and makes it even more unlikely that one person can be said to be overwhelmingly more qualified as a result of substitute qualifications than another. Without going into extensive detail, it is sufficient for the Court to find that, with regard to the positions in which Ms. Smith was rejected because of her qualifications, she has failed to come forward with facts demonstrating that Wellpoint's decision was a pretext for race discrimination.

That leaves only the Forecaster position. Ms. Smith has come forward with evidence that a white applicant was selected for the position, and offers her own statement that she was told

the reason why she was not considered for the position was because Ms. Bane did not receive an application from her. Ms. Smith has adduced evidence that this contention is false, and that the Human Resources Department did indeed have an application from Ms. Smith for that position. The Court has reviewed Wellpoint's briefing, and finds nothing therein that specifically refutes Ms. Smith's contentions with regard to these matters. In these circumstances, the Court finds that Ms. Smith has demonstrated a triable issue of fact as to whether Wellpoint's stated reason for denying her application for this position is a pretext for race discrimination. Notably, Wellpoint's proffered reason for selecting Mr. McDonald over Ms. Smith is not that Mr. McDonald's qualifications were superior[9] – a proffer that Ms. Smith would have difficulty overcoming in light of *Johnson* – but rather that Ms. Smith did not even apply. Because Ms. Smith has come forward with evidence that this contention is false and that Wellpoint was aware that Ms. Smith had applied, Wellpoint is not entitled to summary judgment on her race discrimination claim regarding the denial of her request for the Forecaster position. This claim will be resolved by a trial.

### E. Breach of contract

Finally, the Court turns to Ms. Smith's claim that she was retaliated against for complaining of ethical breaches by her supervisors, in violation of promises made in the Wellpoint Employee Handbook.

Under Colorado law, policies articulated in an employee handbook can amount to

---

[9]It may be that the relative superiority of Mr. McDonald's and Ms. Smith's qualifications will have to be assessed by the factfinder when deciding whether Ms. Smith was actually damaged as a result of not having her application considered, but that is not an issue for resolution by the jury at trial, not for the Court on summary judgment.

promises enforceable in contract in limited situations. Where a reasonable employee would construe the policies as being binding on the employer and where the policies are sufficiently definite so as to allow the Court to understand and enforce them, the Court may treat them as contractual in nature. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711-12 (Colo. 1987); *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 247 (Colo App. 2006) *citing Soderlun v. Public Serv. Corp.*, 944 P.2d 616, 621-22 (Colo. App. 1997). On the other hand, language that constitutes vague assurances or simple descriptions of the employer's present policies do not give rise to contractual effect. *Jaynes*, *id.* at 247.

Ms. Smith's contract claim is premised on a portion of Wellpoint's Standards Manual, which contains a section stating "Any associate who reports in good faith a known or suspected ethical or compliance concern will not be subjected to retaliation or retribution." The parties devote significant effort to arguing whether this language should be given contractual effect and whether disclaimers found in other portions of Wellpoint's handbooks defeat any contractual effect the language might have.

Although these discussions are interesting, they are ultimately irrelevant. Even assuming the language has contractual effect, Ms. Smith has not come forward with evidence that would demonstrate that she was retaliated against for reporting an ethical or compliance concern. The reporting that Ms. Smith refers to is her complaint to Ms. Arambula in February 2006 that certain managers were unethically closing cases without actually working on them. However, as discussed above, the record does not reflect that Mr. Roupas, Ms. Bane, or anybody else taking adverse action against Ms. Smith was aware that Ms. Smith had made such a complaint to Ms. Arambula. As with retaliation claims under Title VII or § 1981, it is only logical to require an

employee claiming improper retaliation to show that the person taking the adverse action was aware of the employee's protected conduct; conversely, one cannot retaliate unless one knows of predicate protected act. Although the retaliation analysis above focused on whether or not Mr. Roupas, Ms. Patrick, or Ms. Bane knew of Ms. Smith's complaints of race discrimination to Ms. Arambula, Ms. Smith's complaint of unethical conduct was made to Ms. Arambula at the same time as the race discrimination complaint, and the record reflects that Ms. Arambula did not disclose either component of that complaint to Mr. Roupas or anyone else prior to Ms. Smith's termination. Thus, even if Wellpoint's handbook is given contractual effect, the undisputed facts in the record demonstrate that Ms. Smith could not establish that the contractual terms were actually breached. Under these circumstances, Wellpoint is entitled to summary judgment on the breach of contract claim.

## CONCLUSION

For the foregoing reasons, Wellpoint's Motion for Summary Judgment **(# 25)** is **GRANTED IN PART**, insofar as Wellpoint is entitled to summary judgment on Ms. Smith's claims of retaliation and breach of contract, and on Ms. Smith's claim of race discrimination as it relates to her termination or the denial of her requests for promotion or transfer to any position other than Forecaster, and **DENIED IN PART**, insofar as there are genuine disputes of fact requiring trial as to whether the denial of Ms. Smith's request for transfer to the Forecaster position constitutes discrimination on the basis of race. Wellpoint's Motion to Strike **(# 33)** is **DENIED** as moot, the Court having treated that motion as part of Wellpoint's reply in support of its summary judgment motion.

In recognition of the pendency of the summary judgment motion, the Court converted the

Pretrial Conference scheduled for August 11, 2010 to a Rule 16 conference and vacated that portion of the Trial Preparation Order that required the submission of a proposed Pretrial Order. In light of the dramatic narrowing of this case as a result of this Order, the Court finds that there remains adequate time before the scheduled August 11, 2010 hearing for the parties to prepare a proposed Pretrial Order consonant with the narrowed scope of the case to be tried. Accordingly, the Court **VACATES** the July 6, 2010 Order **(# 46)** converting the August 11, 2010 hearing and **REINSTATES** that portion of the Trial Preparation Order that directs the preparation and submission of a proposed Pretrial Order, but modifies that requirement such that the parties shall file the proposed Pretrial Order at or before 1:00 p.m. on August 10, 2010.

Dated this 5th day of August, 2010

**BY THE COURT:**

Marcia S. Krieger
United States District Judge